18-1247-cv
Lynch v. City of New York

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2018

(Argued: April 15, 2019　　　　　　　　　　Decided: March 4, 2020)

Docket No. 18-1247-cv

_____

RICHARD LYNCH,

*Plaintiff-Appellant,*

VIENNA RYE,

*Plaintiff,*

- v. -

CITY OF NEW YORK, Police Officer JONMICHAEL DELAROSA, Shield No. 17441, Police Officer MARIANN MANDY, Shield No. 00603, Deputy Inspector ANDREW LOMBARDO, NYPD Legal Bureau Agency Attorney LESTER PAVERMAN,

*Defendants-Appellees,*

JOHN DOES; and RICHARD ROES,

*Defendants.*[*]

_____

---

[*]　　The Clerk of Court is directed to amend the official caption to conform with the above.

Before: KEARSE, WINTER, and POOLER, *Circuit Judges*.

Appeal by plaintiff Lynch from so much of a judgment of the United States District Court for the Southern District of New York, Loretta A. Preska, *Judge*, as dismissed claims asserted by Lynch in the amended complaint, brought under 42 U.S.C. § 1983, principally for false arrest, malicious prosecution, abuse of process, violation of his rights to free speech and equal protection, and use of excessive force, in the arrest of Lynch during a demonstration organized by an affiliate of the Black Lives Matter movement. The district court granted defendants-appellees' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and 12(c), ruling principally that there was probable cause for Lynch's arrest. *See Lynch v. City of New York*, No. 16 Civ. 7355, 2018 WL 1750078 (Mar. 27, 2018). On appeal, Lynch contends that the court erred by failing to accept the factual allegations of the amended complaint as true and failing to draw all reasonable inferences therefrom in his favor. We agree insofar as Lynch asserted claims against the City and the defendant who signed the summonses against him; and we vacate the judgment to that extent and remand for further proceedings.

Affirmed in part; vacated and remanded in part.

JEFFREY A. ROTHMAN, New York, New York, *for Plaintiff-Appellant*.

MELANIE T. WEST, Assistant Corporation Counsel, New York, New York (Zachary W. Carter, Corporation Counsel of the City of New York, Richard Dearing, New York, New York, on the brief), *for Defendants-Appellees*.

KEARSE, *Circuit Judge*:

Plaintiff Richard Lynch appeals from so much of a judgment of the United States District Court for the Southern District of New York, Loretta A. Preska, *Judge*, as dismissed his claims in the amended complaint (or "Complaint" or "Am. Compl."), brought under 42 U.S.C. § 1983 against defendants City of New York (the "City") and several individual members of the City's Police Department ("NYPD"), alleging federal and state claims of, *inter alia*, false arrest, malicious prosecution, abuse of process, infringement of Lynch's rights to free speech and equal protection, and use of excessive force, in connection with his arrest during a demonstration organized by an affiliate of the Black Lives Matter movement. The district court granted defendants-appellees' motion to dismiss the Complaint

pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c), holding principally that there was probable cause for Lynch's arrest. On appeal, Lynch contends that the court erred by failing to accept the factual allegations of the amended complaint as true and failing to draw all reasonable inferences therefrom in his favor. For the reasons that follow, we agree insofar as Lynch asserted claims against the City and the officer who swore out the summonses against him; and we vacate the judgment to that extent and remand for further proceedings.

# I. BACKGROUND

This action sought damages against defendants for Lynch and Vienna Rye as plaintiffs, alleging claims against the City and against individual defendants whose conduct--assuming the truth of the factual allegations in the Complaint-- included the following: NYPD Officer Jonmichael Delarosa arrested and swore out summonses against Rye; NYPD Officer Mariann Mandy arrested and swore out summonses against Lynch; NYPD Deputy Inspector Andrew Lombardo, a supervisor, gave instructions as to how Lynch was to be treated after his arrest; and NYPD Legal Bureau Agency attorney Lester Paverman who conferred with Delarosa,

and "possibly" with Mandy (*see* Part I.B. below), following the arrests of Rye and Lynch and prior to the issuance of their respective summonses. On defendants' motion under Fed. R. Civ. P. 12(b)(6) and 12(c), the action was dismissed in its entirety. Only Lynch has appealed.

A. *The Complaint*

With respect to Lynch, the Complaint included the following factual allegations.

1. *The June 22, 2015 Vigil and March*

On the evening of June 22, 2015, Lynch participated in a vigil and march in New York City, organized by an affiliate of the Black Lives Matter movement. Shortly after the vigil concluded, a large number of people began to march south from 125th Street in Harlem; numerous members of NYPD walked alongside the marchers, escorting the march as it left the location of the vigil. (*See* Complaint ¶¶ 12-13.)

Paragraphs 49-88 of the Complaint describe the actions, participation, and treatment of Lynch. Some eight weeks prior to the vigil and march, Lynch had undergone spinal and thoracic surgery. On June 22, he was moving slowly and was

at the rear of the march as it reached West 104th Street.  (*See* Complaint ¶¶ 49-51.)

There, Lynch "crossed from the north sidewalk of 104th Street to the south sidewalk."

(*Id*. ¶ 52.)  Then, the Complaint alleged,

> [w]hile Plaintiff RICHARD LYNCH was standing on the south sidewalk, without saying a word to him two JOHN DOES members of the NYPD, one male and one female (on information and belief the female officer was Defendant MANDY), ran up behind him, grabbed him, threw him with great force into a van, and handcuffed him with excessive force and painful tightness, on information and belief with plastic flexcuffs.

(*Id*. ¶ 53.)  Thereafter, Lynch was moved to a police car and was taken to a local police precinct, where he was kept in a holding cell for approximately five hours, without being allowed access to a bathroom or being given food or drink.  (*See id*. ¶¶ 55-57, 79.)

Being thrown into the van had caused Lynch immediate pain in his neck and upper and lower back, and he "felt and heard cracking." (Complaint ¶ 54.)  He later experienced sciatica and required spinal epidural injections, a medial branch block, and a radio frequency ablation. (*See id*. ¶ 86.)

2. *The Charges Against Lynch*

Lynch was eventually released from police custody but was given three summonses, each signed by Mandy under penalty of perjury (the "Lynch Summonses").  One summons accused Lynch of disorderly conduct in violation of N.Y. Penal Law § 240.20(5) (the "240.20(5) Summons"), charging as follows:

> At time + place of occurrence (opposite 123 West 104[th] Street at 8:47 p.m. on 6/22/15), *I personally observed [Lynch]*, with the intent to cause public inconvenience, annoyance and alarm, *obstruct vehicular traffic by standing directly in front of a gray Toyota Camry NY Plate CLC 4505*, and did [*sic*] prevent the vehicle and other traffic from continuing eastbound from the midblock location.

(Complaint ¶ 60 (emphases added); *see also id*. ¶ 59.)  Another summons accused him of disorderly conduct in violation of N.Y. Penal Law § 240.20(6) (the "240.20(6) Summons"), charging as follows:

> At time + place of occurrence (opposite 123 West 104[th] Street at 8:47 p.m. on 6/22/15), *I personally observed [Lynch]*, with the intent to cause public inconvenience annoyance, + alarm, *walking in the middle of the street, to wit west 104[th] Street between Columbus and Amsterdam Avenues congregating with a group of others.  [Lynch] was told by undersigned to move to an accessible sidewalk and he refused to do so, continuing westbound* on the street.

(Complaint ¶ 67 (emphases added); *see also id*. ¶ 66)  A third summons accused Lynch

of violating N.Y. Vehicle and Traffic Law § 1156(a) (the "VTL § 1156(a) Summons"), charging:

> At time and place of occurrence indicated herein (opposite 123 West 104th Street at 8:47 p.m. on 6/22/15) *I personally observed [Lynch] walking in the middle of the road on West 104th Street between Columbus and Amsterdam* and [*sic*] Avenues. Sidewalks were available adjacent to the roadway. Available sidewalks were safe to traverse at the time of incident.

(Complaint ¶ 74 (emphasis added); *see also id*. ¶ 73.)

3. *The Complaint's Principal Factual Assertions as to June 22*

The Complaint asserted that none of the above charges was true. As to the 240.20(5) Summons, which stated that near 123 W. 104th Street Lynch had stood directly in front of a certain Toyota to block vehicular traffic, the Complaint alleged, *inter alia*, that Lynch "did not obstruct any vehicular traffic" (Complaint ¶ 63), and that "*[o]ther than crossing the street from one sidewalk to the other sidewalk at W. 104th Street, Plaintiff RICHARD LYNCH was not in the roadway at that location*" (*id*. ¶ 65 (emphases added)).

As to the 240.20(6) Summons, which charged that Lynch had disobeyed Mandy's order to get out of the street and onto the sidewalk, the Complaint--having

8

indicated that Lynch's initial encounter with Mandy occurred when she and another officer, without a word, grabbed him as he "was standing on the south sidewalk" at 104th Street (Complaint ¶ 53)--denied that Mandy had given him any such instruction:

> 70.  *Defendant MANDY never told Plaintiff to move to the sidewalk, and Plaintiff never refused to move to the sidewalk.*
>
> 71.  Defendant MANDY never said anything at all to Plaintiff RICHARD LYNCH prior to brutalizing him and falsely arresting him.
>
> 72.  *Other than crossing the street from one sidewalk to the other sidewalk at W. 104th Street, Plaintiff RICHARD LYNCH was not in the roadway at that location.*

(Complaint ¶¶ 70-72 (emphases added).)

As to the VTL § 1156(a) Summons, which stated that Mandy observed Lynch walking in the middle of West 104 Street, the Complaint again alleged that

> [o]ther than crossing the street from one sidewalk to the other sidewalk at W. 104th Street, Plaintiff RICHARD LYNCH was not in the roadway at that location.

(*Id.* ¶ 76.)

9

### 4. *The Termination of the Prosecution of Lynch*

In January 2016, after Lynch had been required to appear in criminal court on four occasions to defend against the above charges, all charges against him were dismissed.

### B. *The District Court's Dismissal of the Present Action*

The present action was commenced in September 2016 against the City, Delarosa, Mandy, and Lombardo, asserting, to the extent pertinent to this appeal, that the arrest of Lynch violated his rights under the United States Constitution and state law by subjecting him to, *inter alia*, false arrest, malicious prosecution, abuse of process, the use of excessive force, and infringement of his rights of free speech and equal protection. The amended complaint added Paverman as a defendant and alleged that, as an NYPD attorney, he had colluded with Delarosa, and "possibly with" Mandy, to fabricate false narratives for the summonses issued, respectively, to Rye and Lynch (Complaint ¶ 45). Defendants other than Paverman filed an answer (denying most of the Complaint's allegations), and all defendants moved to dismiss the action pursuant to Rules 12(b)(6) and 12(b)(c).

In a Memorandum and Order dated March 27, 2018, *see Lynch v. City of New York*, No. 16-cv-7355, 2018 WL 1750078 (S.D.N.Y. Mar. 27, 2018) ("*Lynch*"), the district court granted the motion.  To the extent pertinent to Lynch, the court ruled that the claims asserted against Paverman were insufficient because they were based on bare and conclusory assertions.  *See Lynch*, 2018 WL 1750078, at *4 ("The claims against Paverman are dismissed because the allegations in the Am. Compl. fail to raise a right to relief above the speculative level." (internal quotation marks omitted)).

As to the other defendants, the court ruled that Lynch "fail[ed] to state federal law claims," principally because there was "probable cause to arrest Lynch for walking on the roadway when a sidewalk was available."  *Id*. at *5, *6; *see id*. at *7 ("Lynch participated in the march, which was proceeding through the roadway, when sidewalks were available, even after officers gave a lawful order to disperse.").  The court concluded that "[a]ccordingly . . . there was probable cause to make an arrest" *id*. at *7, and "probable cause vitiates several of [Lynch's] claims for relief," *id*. at *5; *see also id*. at *7-*9 (finding that Lynch's federal claims failed because NYPD officers had probable cause to arrest him for his conduct during the march).

Judgment was entered dismissing the Complaint in its entirety.

# II. DISCUSSION

On appeal, Lynch contends principally that the district court erred in failing to accept the factual allegations in his Complaint as true, and instead assuming the truth of the assertions made in the summonses issued by Mandy. For the reasons that follow, we agree that Lynch adequately stated claims against Mandy and the City; we conclude that the Complaint was insufficient to state claims against the other defendants.

## A. *Principles Governing Motions Under Rules 12(b)(6) and 12(c)*

Two well established sets of principles are material to this appeal: one concerns the standards a complaint must meet in order to avoid dismissal on a motion arguing lack of legal sufficiency; the other concerns the standards by which the court is to judge the complaint in considering such a motion.

### 1. *What the Plaintiff Must Do*

Rule 8 of the Federal Rules of Civil Procedure requires, *inter alia*, that a pleading seeking relief "must contain . . . a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("*Iqbal*") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("*Twombly*")). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

> [O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. [*Twombly*, 550 U.S.] at 556. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than *the mere possibility of misconduct*, the complaint has alleged--but it has not "show[n]"--"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

*Iqbal*, 556 U.S. at 679 (emphasis added). To present a plausible claim, the "pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted).

13

### 2. *What the Courts Must Do*

The court, in deciding a Rule 12(b)(6) motion to dismiss a complaint, is required to accept all "well-pleaded factual allegations" in the complaint as true. *Iqbal*, 556 U.S. at 679; *see Twombly*, 550 U.S. at 555; *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009) (en banc) ("*Arar*"), *cert. denied*, 560 U.S. 978 (2010). Although allegations that are "conclusory" are "not entitled to be assumed true," *Iqbal*, 556 U.S. at 681; *see, e.g., Twombly*, 550 U.S. at 554-55, "*[w]hen there are well-pleaded factual allegations, a court should assume their veracity* and then determine whether they plausibly give rise to an entitlement to relief," *Iqbal*, 556 U.S. at 679 (emphasis added); *see also id*. at 678 (a court is "not bound to accept as true a [pleading's] legal conclusion," but "for the purposes of a motion to dismiss [it] must take all of the factual allegations in the complaint as true"). The court must also "construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Arar*, 585 F.3d at 567; *see, e.g., Iqbal*, 556 U.S. at 678; *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that [for granting] a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics*, 259 F.3d 123, 126 (2d Cir. 2001).

14

The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal" conduct. *Twombly*, 550 U.S. at 556; *see Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." (internal quotation marks omitted)).

Thus, the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side:

> Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible. *See generally Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("two or more witnesses" may tell mutually inconsistent but "coherent and facially plausible stor[ies]"). The choice between or among plausible inferences or scenarios is one for the factfinder . . . .
>
> The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.

*Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 184-85 (2d Cir. 2012) ("*Anderson News*"), *cert. denied*, 568 U.S. 1087 (2013); *see, e.g., Todd v. Exxon Corp.*, 275

F.3d 191, 203 (2d Cir. 2001) ("fact-specific question[s] cannot be resolved on the pleadings"). "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

Whether a complaint alleges sufficient facts to show the plaintiff's entitlement to relief is a question of law, which we consider *de novo*. *See, e.g.*, *PHL Variable Insurance Co. v. Town of Oyster Bay*, 929 F.3d 79, 89 (2d Cir. 2019); *Rothstein v. UBS AG*, 708 F.3d 82, 90 (2d Cir. 2013); *Anderson News*, 680 F.3d at 185; *Arar*, 585 F.3d at 567; *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996). Thus, as is true of the district court, we are not to give effect to a complaint's assertions of law or legal conclusions couched as factual allegations; we are to accept well pleaded factual assertions as true; and we are to draw all reasonable factual inferences in favor of the plaintiff.

B. *Lynch's Complaint*

Application of these principles here requires focused attention to the Complaint's allegations with respect to each defendant, *see generally Iqbal*, 556 U.S. at 684.

16

1. *Against Mandy*

The district court found that "there was . . . probable cause to arrest Lynch" because he was "walking on the roadway when a sidewalk was available," *Lynch*, 2018 WL 1750078, *id*. at *6, and because, "Lynch participated in the march, which was proceeding through the roadway, when sidewalks were available, even after officers gave a lawful order to disperse," *id*. at *7; *see also id*. at *6 (noting that the existence of probable cause for arrest on any one ground suffices to defeat claims such as false arrest). The court noted the Complaint's acknowledgement that there were "'a large number of'" marchers and that "'member(s) of the NYPD directed *some* of the marchers to get out of the roadway *during the course of the march*,'" *id*. at *11 (quoting Complaint ¶¶ 12, 15) (emphases ours), and inferred that Lynch had been so directed and had refused to comply with that order, *see Lynch*, 2018 WL 1750078, at *11. These findings did not comport with the proper standards.

First, the Complaint's quoted allegations in ¶¶ 12 and 15 as to instructions given "during" the march to "some" marchers were entirely unspecific as to persons, place, or time. They did not warrant the court's inference that Lynch was one of the marchers given such an instruction, or that it was given to him--as Mandy asserted as the basis for his arrest--at around 8:47 p.m. on W. 104th Street. Indeed,

17

given the Complaint's allegation in ¶ 70 (that Lynch "*never refused* to move to the sidewalk" (emphasis added)), which the court was required to accept as true, the court was required to infer that the instruction referred to in ¶ 15 either was not given to Lynch or was not disobeyed by Lynch.

Second, the court's analysis of probable cause to arrest Lynch was flawed by the fact that it also overlooked other factual allegations in the Complaint as to the conduct of Lynch that were contrary to Mandy's assertions in the Lynch Summonses. Those summonses (each of which was quoted by the district court, *see Lynch*, 2018 WL 1750078, at *3) charged that at 8:47 p.m. opposite 123 W. 104th Street, Lynch (1) was standing in front of a Toyota with the intent to cause public inconvenience and obstruct vehicular traffic, (2) was walking in the middle of the street, and (3) was walking and congregating with others in the middle of the street and refusing Mandy's order to move to the sidewalk. In contrast, the Complaint not only alleged that Lynch "did not obstruct any vehicular traffic" (Complaint ¶ 63), that "Mandy never told [Lynch] to move to the sidewalk" (*id.* ¶ 70), and that "[Lynch] never refused to move to the sidewalk" (*id.*), but also alleged, as noted in Part I.A.3. above, that

> [o]ther than crossing the street from one sidewalk to the other sidewalk at W. 104[th] Street, Plaintiff RICHARD LYNCH was not in the roadway at that location

(*id.* ¶¶ 65, 72, 76).

18

In the district court's decision, paragraphs 63, 65, 70, 72, and 76 were not discussed or cited; none of their factual allegations as to Lynch's own conduct was ever mentioned. Those allegations were required to be accepted as true for purposes of deciding defendants' Rule 12(b)(6) and 12(c) motions to dismiss. As thus accepted, they precluded any finding that the Lynch Summonses showed probable cause for Lynch's arrest as a matter of law.

We conclude that the district court erred in granting defendants' motion to dismiss Lynch's claims against Mandy.

2. *Against Delarosa*

The Complaint did not, however, assert any viable claims on behalf of Lynch against Delarosa. While asserting that Delarosa had thrown Rye to the ground, had signed three summonses against Rye, and had colluded with Paverman to make false accusations against Rye, it contained no allegations connecting Delarosa to the arrest or treatment of Lynch. There is only one paragraph of the Complaint that mentions both Delarosa and Lynch, and its thrust is to accuse Paverman of colluding with Delarosa and accuse Paverman of "possibly" colluding with Mandy (*see* Part II.B.4. below). There are no factual allegations that there was any conduct

19

constituting infringement of Lynch's rights by Delarosa. Any purported claims by Lynch against Delarosa were properly dismissed.

3. *Against Lombardo*

The Complaint also failed to assert any viable claims on behalf of Lynch against Lombardo. It alleged that Lombardo headed a task force that responded to public demonstrations (*see* Complaint ¶ 78); that he has a reputation for being hostile to the rights of demonstrators (*see id*. ¶ 85); that Lynch "sometimes goes by the name / title 'the Angry Pacifist'" (*id*. ¶ 82); that Lombardo has "know[n] [Lynch] well, for a long time, and engaged in a stare-down with [Lynch] at the precinct" (*id*. ¶ 81); and it alleged only conclusorily that Lombardo and the other defendants "fail[ed] to protect the plaintiffs from the unjustified and unconstitutional treatment they received at the hands of other defendants" (*id*. ¶ 94), and "fail[ed] to properly train, supervise, or discipline their subordinates" (*id*. ¶ 97). There is no factual allegation that Lombardo was involved in the arrest of Lynch or in the preparation of the Lynch Summonses, or that Mandy was among the officers supervised by Lombardo.

The Complaint also alleged that Lynch, who was detained at the precinct for some five hours before being released (*see* Complaint ¶ 57), was informed by one

20

officer that Lombardo instructed that Lynch be denied food, drink, and access to a bathroom (*see id*. ¶¶ 79, 80), and implied that such an instruction may have been intended as punitive, given Lombardo's alleged hostility to demonstrators in general and to Lynch in particular (*see id*. ¶¶ 85, 81).  An arrestee who has not been adjudged guilty of a crime is of course entitled to due process and cannot properly be subjected to punishment. *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  But "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense," *id*. at 537; there is "a *de minimis* level of imposition with which the Constitution is not concerned," *id*. at 539 n.21 (quoting *Ingraham v. Wright*, 430 U.S. 651, 674 (1977)).

While the Complaint alleged that Lynch suffered various serious medical consequences from being thrown into the van during his arrest (*see id*. ¶ 86), it contains no allegation that he made a request for or had any need for food, drink, or access to a bathroom--and no allegation that the lack of those accommodations for the several hours he was detained had any untoward consequences whatsoever. Lynch's allegations did not rise above the de minimis level to indicate a deprivation of constitutional dimension.

We conclude that the Complaint was properly dismissed insofar as it purported to assert claims on behalf of Lynch against Lombardo.

4. *Against Paverman*

Paverman, an attorney in the NYPD Legal Bureau Agency ("Legal Bureau"), was not named as a defendant in the original complaint but was added in the amended complaint. In the amended complaint, other than two paragraphs asserting that Paverman (along with other defendants) had failed to protect plaintiffs from the violations by other defendants (*see* Complaint ¶ 94) and had "fail[ed] to properly train, supervise, or discipline their subordinates" (*id*. ¶ 97), the allegations as to Paverman were as follows:

> 45. On information and belief, *Defendant PAVERMAN colluded* with Defendant DELAROSA to construct false allegations as to what Defendant DELAROSA had allegedly "personally observed" Plaintiff VIENNA RYE do to supposedly justify her arrest (and *possibly with Defendant MANDY to construct false allegations as to what Defendant MANDY had allegedly "personally observed" Plaintiff RICHARD LYNCH do to supposedly justify his arrest).*

(*Id*. ¶ 45 (emphases added).)

22

The district court dismissed the claims against Paverman on the ground that the allegations against him "fail[ed] to raise a right to relief above the speculative level." *Lynch*, 2018 WL 1750078, at *4 (internal quotation marks omitted)). Based on the allegations in the Complaint, we have no difficulty with this conclusion. The charges in ¶¶ 94 and 97 that Paverman failed to protect plaintiffs and failed to train, supervise, or discipline his subordinates are conclusory. And as to the contention that Mandy made false statements in the Lynch Summonses, the Complaint's allegation of participation by Paverman was both conclusory and literally speculative, alleging only that Paverman "colluded . . . *possibly* with Defendant MANDY" (Complaint ¶ 45 (emphasis added)). An allegation merely that something "possib[l]y" happened does not qualify as a "well-pleaded factual allegation[]," whose "veracity" the court "should assume." *Iqbal*, 556 U.S. at 679; *see id*. at 678 (the allegation of a mere "possibility" falls on the ineffective side "of the line between possibility and plausibility of 'entitlement to relief'" (quoting *Twombly*, 550 U.S. at 557)).

On appeal, Lynch states that the amended complaint's ¶ 45 allegation linking Paverman with Mandy was based on a June 22, 2015 entry in a memo book maintained by Delarosa, produced to plaintiffs by defendants as part of the limited discovery that followed the filing of the original complaint. (*See* Lynch brief on

23

appeal at 6-7.)  Lynch describes that Delarosa entry for 9:50 p.m. on June 22 as follows:

> "As per PO Mandy & Cpt [Captain] Lombardo a consultation with Agency Attorney Paverman, Less [Lester] was conducted regarding" and the next line and 3/4 is redacted based upon the attorney-client privilege.

(Lynch brief on appeal at 23 (quoting Delarosa memo book) (brackets in brief).) Lynch argues that the facts that Delarosa (a) recorded that he consulted with Paverman some 10 minutes before he signed his summonses against Rye, and (b) referred to Mandy in the same way--"As per PO Mandy"--permit the inference that Paverman participated in Mandy's preparation of her allegedly false statements in the Lynch Summonses.  Lynch contends that the district court should have deemed these factual statements in the Delarosa memo book to be part of, and "'integral to,'" the Complaint (*see* Lynch brief on appeal at 6-8 & n.4, 23), quoting *International Audiotext Network, Inc. v. AT&T*, 62 F.3d 69, 72 (2d Cir. 1995) ("*Audiotext*"). We are unpersuaded.

It is well established that a pleading is deemed to include any "written instrument" that is attached to it as "an exhibit," Fed. R. Civ. P. 10(c), or is incorporated in it by reference, *see, e.g.*, *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991); *Goldman v. Belden*, 754 F.2d 1059, 1065-66 (2d Cir. 1985).

24

And even if the "plaintiff chooses not to attach" an instrument "to the complaint or [to] incorporate [it] by reference," if it is one "upon which" the plaintiff "solely relies and which is integral to the complaint," the court may take the document into consideration in deciding the defendant's motion to dismiss. *Audiotext*, 62 F.3d at 72 (internal quotation marks omitted).  However, Lynch's reliance on these principles is misplaced.  The term "written instrument" generally refers to "a 'legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate[,]' Black's Law Dictionary (10th ed.2014)." *Smith v. Hogan*, 794 F.3d 249, 254 (2d Cir. 2015).  Thus, we view "the types of exhibits incorporated within the pleadings by Rule 10(c)" as "consist[ing] largely of . . . contracts, notes, and other writing[s] on which [a party's] action or defense is based." *Id*. (internal quotation marks omitted).

Lynch might not have been aware of any conversation between Mandy and Paverman but for defendants' production of Delarosa's record, and that record would constitute some evidence that a conversation between the two occurred.  But unlike the document at issue in *Audiotext*--an agreement of a type that the antitrust defendant had with another party but refused to enter into with the plaintiff, *see Audiotext*, 62 F.3d at 71--the Delarosa record plainly is not an "instrument" on which

25

Lynch can rely as defining rights, duties, entitlements, or liabilities. And Delarosa's cryptic note mentioning Mandy, while perhaps providing a lead to evidence that might support Lynch's claim against Paverman for a fraudulent collaboration with Mandy, is not "integral" to that claim, which does not depend on there being written evidence that a meeting occurred.

We see no error in the district court's dismissal of Lynch's claims against Paverman.

5. *Against the City*

Plaintiffs sought to hold the City liable for their injuries, alleging that the individual defendants' violations of their rights resulted from *de facto* policies, practices, customs, and usages of the City, through NYPD (*see*, *e.g.*, Complaint ¶ 101), principally by having police officers "mak[e] false statements concerning" their observations of "demonstration-related arrestees and the circumstances of their arrests" (*id*. ¶ 105) (the alleged "False Observation" practice). *See* 42 U.S.C. § 1983 (imposing liability for violation of federal rights "under color of any statute, ordinance, regulation, custom, or usage, of any State"); *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978) ("persistent and widespread . . . practices of state

26

officials," even if "not authorized by written law, . . . could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law").

The district court dismissed the municipal liability claims on the grounds that the Complaint--which it characterized as "conclusory" and making merely "boilerplate assertions" of municipal custom or policy--both lacked adequate allegations of any violations of plaintiffs' constitutional rights and failed to allege a causal link between an official policy or custom and the claimed violations. *Lynch*, 2018 WL 1750078, at *13-*14. The court found that "Plaintiffs allege[d] no facts to indicate any deliberate choice by municipal policymakers to engage in unconstitutional conduct," and that they alleged "that the Municipal Defendants acted pursuant to '*de facto* policies, *practices*, customs, and usages' *without any facts suggesting the existence of the same*." *Id*. at *14 (emphases added).

For the reasons set out in Part II.B.1. above, the court's first rationale--that the Complaint failed to state viable claims against any individual defendant--was erroneous as to the claims of Lynch against Mandy. The Complaint contained well-pleaded allegations of fact as to Lynch's conduct that, if accepted as true, precluded the court's rejection of his claims on the ground that there was probable cause for his arrest. The court's second rationale is undercut both by the above error in failing to

27

recognize that Lynch adequately pleaded claims against Mandy, and, as discussed next, by the fact that its assessment of the Complaint's City policy allegations principally applied standards that are applicable to post-pleading stages of adjudication, rather than applying the *Twombly-Iqbal* plausibility standard.

The Complaint, in asserting that plaintiffs had been arrested as a result of the City's alleged False Observation practice, set out--largely in a single paragraph (¶ 105) spanning 10 pages--facts designed to show a past and persistent False Observation practice. It alleged generally that

> *[a]rresting officers have been told*--on a number of prior occasions *by attorneys within the NYPD's Legal Bureau--to lie that they had "personally observed"* a demonstration-related arrestee do certain acts, *when the arresting officer in fact had never personally observed the arrestee do those acts*.

(Complaint ¶ 105, pp. 17-18 (emphases added).) In support of these allegations, the Complaint alleged, *inter alia*, that the City had engaged in False Observation practices when mass arrests were made during demonstrations in connection with the Republican National Convention in 2004; and that in the ensuing litigation in *MacNamara v. City of New York*, No. 04-cv-9216 (S.D.N.Y.) ("*MacNamara*"), one NYPD officer, Officer Cai, gave deposition testimony (quoted in Complaint ¶ 105, pp. 19-23), contrasting his actual observations at the demonstrations with the observations that

28

he was instructed to, and did, describe in his NYPD arrest records, including

- that an NYPD Legal Bureau lieutenant had "give[n him] the words [he] should use to write" in his "memo book," in his "online booking sheet," to make entries stating that demonstrators had forced pedestrians into the street, although in fact he did not "see any pedestrians at any point forced from the sidewalk onto the street" (*id.* ¶ 105, p. 19);

- that the Legal Bureau lieutenant had instructed him to state in his memo book that a certain NYPD captain had given an order to disperse, although in fact he "did not hear" that captain "give any orders to disperse" (*id.* ¶ 105, p. 20);

- that the Legal Bureau lieutenant first asked Officer Cai "about what [he] saw and what was taking place at the particular time and location" and "then told [him] what to write in the narrative portion on the online booking sheet and in [his] memo book" (*id.*);

- that the Legal Bureau lieutenant "recite[d] to [him] the words that [he] should write down, and [he] wrote it down as they [*sic*] said the words" (*id.*);

- that Officer Cai wrote that demonstrators "marched on the sidewalk" but he did not "ever see them on the sidewalk" (*id.* ¶ 105, p. 22-23); and

- that "[t]hat's the story *they* told us to write, *the legal bureau. . . .* I told them[] what happened, what I saw. *They were like, this is the form that you're going to be writing.*" (*Id.* ¶ 105, p. 23 (emphases ours).)

The Complaint alleged that two federal judicial officers in *MacNamara*

characterized Cai's testimony as at least

"disturbing." Indeed, one reasonable interpretation of Officer Cai's testimony is that he included false information in the narrative section of his booking report because he was instructed to do so by a Lieutenant in the NYPD Legal Bureau. *More disturbing still, Officer Cai's testimony appears to indicate that this unlawful act was not an isolated incident*.

(Complaint ¶ 105, p. 18 (quoting *MacNamara*, No. 04-cv-9216, Dkt. No. 213 (Order of Karas, *D.J.*, at 1-2 (S.D.N.Y. Sept. 21, 2007) (quoting Francis, *M.J.*))) (emphasis ours).)

A later opinion similarly stated that

Cai's testimony . . . can be construed as indicating that [he] recorded events that he did not witness as if he had personally observed them. That could well constitute a fraud, since subsequent participants in the arrest procedure--and ultimately the criminal court--would be expected to rely on the accuracy and reliability of the arresting officer's narrative.

*MacNamara*, 2007 WL 3196295, at *2, 2007 US Dist. LEXIS 79870, at *8 (Memorandum and Order of Francis, *M.J.*, S.D.N.Y. Oct. 30, 2007).

The Complaint also alleged that the City's False Observation practice was ongoing. It described five lawsuits that were pending when the Complaint was filed in March 2017, in which those plaintiffs alleged that a Legal Bureau attorney had participated in the creation of false records as to the arresting officer's observations in the so-called Occupy Wall Street ("OWS") demonstrations in 2011 and 2012. The Complaint noted that in two of those actions the court had declined to dismiss false

30

arrest claims against Legal Bureau attorneys (*see* Complaint ¶ 105, p. 24); that in a third action the court had reinstated a denial-of-fair-trial claim against a Legal Bureau attorney (*id*. ¶ 105, p. 25); that in a fourth action the record on a motion for summary judgment was sufficient to establish that arresting officers, as a result of their meetings with Legal Bureau, had created false processing paperwork (*id*.); and in the fifth action, the arresting officer "*testified that an NYPD Legal Bureau attorney told him what to write 'word for word' in his arrest processing paperwork, as a result of which he created arrest processing paperwork containing false statements*" (*id*. ¶ 105, pp. 25-26 (emphasis ours)).

In dismissing the present case, the district court summarily rejected the Complaint's proffer of these "numerous litigations as evidence of the 'official policy' element" of municipal liability claims, stating, *inter alia*, that

> the Court of Appeals has stated that "citation to various lawsuits . . . *[is] not probative* of the existence of an underlying policy." *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 23 (2d Cir. 2012); *see Mediavilla v. City of N.Y.*, 259 F.Supp.3d 82, 110 (S.D.N.Y. 2016) (holding that "references to other litigations are insufficient to establish the requisite policy or practice required to sustain *Monell* claims.").

*Lynch*, 2018 WL 1750078, at *14 (emphasis ours). Reliance on these cited decisions was

31

inapt, however, because they dealt with motions for summary judgment and proffers of proof, not with motions under Rules 12(b)(6) or 12(c).

The district court also refused to consider the alleged facts to which Officer Cai testified in his deposition in *MacNamara*, to wit, that he had been instructed by the Legal Bureau to state, as grounds for arrests, that he had observed acts and conduct that he in fact had not seen. As to this, the court stated that "deposition testimony taken in a different action is only *admissible* if the present action involves the same subject matter and the same parties." *Lynch*, 2018 WL 1750078, at *14 (internal quotation marks omitted) (emphasis ours). Admissibility, however, is an issue for trial or summary judgment; in order to state a claim that is sufficiently plausible to avoid dismissal at the pleading stage, the fact asserted need not be presented in a form that would be admissible at trial. The plausibility standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal" conduct. *Twombly*, 550 U.S. at 556. The extensively quoted deposition testimony of Cai in *MacNamara*--and the allegation that there was similar testimony by an arresting officer in one of the OWS cases--made it plausible that the City had engaged in the alleged False Observation practice in 2004 and 2011.

We note that the Complaint's allegations of the Cai testimony or of the OWS litigation allegations, might not, if viewed piecemeal, be sufficient to state a plausible claim that the City had a False Observation practice in 2015 when Lynch was arrested. The testimony of Officer Cai concerned events that occurred in 2004 and that were criticized in publicly filed court decisions, including at least one published opinion, in 2007. It might therefore be implausible to infer from the 2004 events alone that the City would have continued such a practice after public judicial criticism in 2007. And even the description of the 2017 pendency of OWS lawsuits, to the extent that the Complaint cited merely allegations as to NYPD's engagement in the False Observation practice in 2011-2012, would likely not suffice on their own as plausible indicia that the practice described by Cai had continued, because stating that certain conduct has been alleged is not a statement that it in fact occurred.

However, as to the plausibility of the Complaint's allegations that the False Observation practice also existed in 2015 and resulted in the arrest of Lynch, we view the allegations of the Complaint in combination rather than piecemeal; and we conclude that the Complaint was sufficient when taken as a whole. Accepting as true the Complaint's allegations that the City at least in 2004 and seven or eight years thereafter in fact engaged in the False Observation practice and that at least two

33

NYPD officers have so testified, the Complaint plausibly allows the inference that notwithstanding the 2007 publicly recorded judicial criticisms of that practice, the City knowingly did not end that practice. Since the facts alleged in the Complaint as to the conduct of Lynch, if accepted as true, mean that the Lynch Summonses signed by Mandy contained false statements as to her observations, an inference favorable to Lynch may reasonably be drawn that the false statements by Mandy resulted from a continuation of the City's False Observation practice.

We conclude that Lynch's claims against the City should be reinstated.

CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this appeal and, for the reasons discussed above, have found them to be without merit except as indicated. Lynch's claims against Mandy--and the City--that either were viable only if there was no probable cause for his arrest, or were dependent on a resolution of the factual dispute as to what circumstances confronted the officers who participated in Lynch's arrest, were erroneously dismissed. We leave it to the district court, taking account of Complaint allegations of Lynch's conduct that

34

were previously overlooked, to revisit such claims as do not directly turn on issues of whether probable cause existed or on which side's version of the existing factual circumstances is correct.

The judgment as to Lynch is affirmed insofar as it dismissed pursuant to Rule 12(b)(6) or Rule 12(c) his claims against defendants other than Mandy and the City. To the extent that it dismissed his claims against Mandy and the City, the judgment is vacated, and the matter is remanded for further proceedings.